{¶ 1} Relator, NIFCO, LLC ("NIFCO") has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting temporary total disability ("TTD") compensation to respondent Tracey Woods ("claimant") beginning April 30, 2002, and to issue a new order denying said compensation on grounds that claimant voluntarily abandoned her employment at Nifco.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, the matter was referred to a magistrate of this court to conduct appropriate proceedings. The magistrate has rendered a decision, including findings of fact and conclusions of law, and has recommended that this court deny the requested writ of mandamus. (Attached as Appendix A.) Relator has filed objections to the magistrate's decision, but the objections do not literally comply with the requirements of Civ.R. 53. For that reason and the reasons that follow, relator's objections will be overruled.
 {¶ 3} Claimant sustained a work-related injury to her left shoulder on April 24, 2002. On the same day, claimant sought medical treatment at an urgent care facility. She was examined by Dr. Thomas Vajen, who opined that claimant could return to work "with restrictions" from April 25 to April 29, 2002. The restrictions were defined as "light duty and no lifting over ten pounds and no repetitive use of the left arm."
 {¶ 4} Claimant returned to the urgent care facility on April 25, 2002. She was examined by Dr. John Scott, who reiterated that claimant should not use her left arm until April 29, 2002. Claimant again visited the urgent care center on April 30, 2002, and was examined by Dr. John Hazlip. On that day, Dr. Hazlip certified that claimant was "totally disabled from work from 4/30/02 to 5/6/02."
 {¶ 5} After intervening medical treatment, claimant returned to the urgent care center on May 10, 2002, and was examined by Dr. Charles Pruitt, who opined that claimant could return to work from May 10 to May 16, 2002, with the same restrictions previously imposed.
 {¶ 6} On May 13, 2002, an urgent care physician certified that claimant was "totally disabled from work from 5/10/02 to 5/15/02." On May 14, 2002, claimant was examined by orthopedist Dr. David J. Wyatt. Dr. Wyatt completed a C-84 on May 21, 2002, in which he certified a period of TTD beginning May 14, 2002, to an estimated return-to-work date of June 3, 2002.
 {¶ 7} Claimant's claim for workers' compensation benefits was allowed by the Bureau of Workers' Compensation ("bureau") for a left shoulder sprain. TTD compensation was granted beginning April 30, 2002, based upon the urgent care documentation. Relator administratively appealed.
 {¶ 8} In a letter dated May 14, 2002, relator terminated claimant's employment. According to the letter, claimant, on April 24, 2002, informed relator that she needed to work in a light-duty position that did not require her to use her left arm. The letter further stated that relator reviewed the physician's requirements for light duty and found a position that would accommodate those requirements. The letter further averred that relator called claimant on April 24, 2002, informed her that a position was available to accommodate the physician's restrictions, and told her she was to report to work on April 25, 2002. The letter further indicated that claimant had not reported to work since April 24, 2002.
 {¶ 9} The letter went on to note that relator's attendance policy permits the termination of employment after an employee accumulates seven or more attendance points. According to the letter, claimant had accumulated eight and one-half points as of May 14, 2002, and was therefore subject to termination. In particular, the letter averred that claimant has been "pointed" as follows:
Date Points
 7/18/01 1.00 4/02/02 1.00 4/04/02 0.50 4/08/02 1.00 4/25/02 1.00 4/26/02 1.00 5/13/02 1.00 5/14/02 2.00 no call/no show
Total 8.50 points
 {¶ 10} The stipulated evidence includes relator's written attendance policy, which provides that each employee is provided seven unpaid "occurrence" days on a "revolving year" basis beginning on the date of the first "occurrence." The policy requires that employees report absences as far in advance of their regularly scheduled work shift as possible, indicating the duration of the absence and the estimated return-to-work date. A point value is assigned to each category of "occurrence." Pertinent to this appeal, one "occurrence" point is assigned for both a full day's absence and the completion of less than one-half of a work shift; one-half point is assigned for completion of less than one-half of a work shift; and two points is assigned when an employee fails to call in and does not report to work. The policy also provides that if an employee is away from work for two or more consecutive days and a physician's note is submitted, only one "occurrence" point will be assigned. The stipulated record includes claimant's acknowledgement, dated August 31, 2001, indicating that she read and understood relator's attendance policy.
 {¶ 11} Following a June 20, 2002 hearing, a district hearing officer ("DHO") issued an order denying TTD compensation from April 30, 2002. The DHO found that under relator's attendance policy, employees are assigned "occurrence" points for sick days even when the employee calls off appropriately or properly submits a written physician's excuse for an extended illness. The DHO further found that claimant properly reported her absence from work due to her injury on April 25, 26, and 29, 2002, and properly faxed physicians' excuses for extended absences on April 30 and May 7, 2002. In addition, the DHO found that claimant neither called in nor appeared for work on May 14, 2002. The DHO agreed with relator's contention that as of May 14, 2002, claimant had accumulated eight and one-half "occurrence" points and was thus subject to termination under the provisions of relator's attendance policy. Citing State ex rel.Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401, the DHO found that because claimant violated a written work rule, the consequence of which was known to claimant to be termination, she voluntarily abandoned her employment and was thus not entitled to TTD compensation. Claimant administratively appealed the DHO's order.
 {¶ 12} Following a July 23, 2002 hearing, a staff hearing officer ("SHO"), relying on State ex rel. Pretty Products, Inc. v. Indus. Comm.
(1996), 77 Ohio St.3d 5, found that claimant had not voluntarily abandoned her employment and was therefore entitled to TTD compensation. Based upon reports of the urgent care physicians from April 30 to May 13, 2002 and Dr. Wyatt's C-84 dated May 21, 2002, the SHO ordered TTD compensation paid from April 30 to June 3, 2002, and continuing upon submission of proof. In so concluding, the SHO found that, based upon submitted telephone records and claimant's hearing testimony, claimant properly advised relator that she would be absent from work on April 25, April 26, and May 13, 2002, due to her injury. Accordingly, the SHO found that relator could only assess a total of four and one-half "occurrence" points as follows:
 07/18/2001 — 1 04/02/2001 — 1 04/04/2002 — .5 04/08/2002 — 1 05/14/2002 — 1
4.5 points
 {¶ 13} It is well-established that a discharge from employment may be characterized as voluntary in some circumstances. State ex rel. Wattsv. Schottenstein Stores Corp. (1993), 68 Ohio St.3d 118. InLouisiana-Pacific, supra, the claimant was terminated from employment for violating a company policy prohibiting three consecutive unexcused absences. The Ohio Supreme Court held that the claimant's discharge constituted a voluntary abandonment of employment because the policy (1) clearly defined the prohibited conduct in writing, (2) identified the violation as a dischargeable offense, and (3) was known or should have been known to the claimant.
 {¶ 14} Where a claimant has voluntarily relinquished employment, either by resigning or abandoning employment under Louisiana-Pacific,
supra, the claimant is deemed to have accepted the consequence of being without wages for a period of time and is not eligible to receive TTD compensation. See, e.g., State ex re. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559. However, in Pretty Products, supra, the Ohio Supreme Court distinguished Louisiana-Pacific, determining that where the employee's conduct is causally related to the industrial injury, the termination of employment is not voluntary.
 {¶ 15} In the instant mandamus action, relator argued that the commission abused its discretion in refusing to recognize relator's assessment of "occurrence" points for April 25, April 26, and May 13, 2002, on grounds that those points were related to the industrial injury. In support of its position, relator presented a two-fold argument. Relator first argued that the commission was bound to accept relator's attendance policy as written and applied by relator, that is, that "occurrence" points may be assessed against an employee for missed days of work regardless of whether the absence is related to an industrial injury. Relator asserted that Louisiana-Pacific required the commission to accept claimant's termination as a voluntary abandonment of employment without regard to the industrial injury. The magistrate correctly rejected that argument on the authority of Pretty Products,Inc. Relator has not objected to the magistrate's finding in this regard. Moreover, we note that any such objection would be unavailing, given the Ohio Supreme Court's holding in Pretty Products, Inc. and its recent decision in Coolidge v. Riverdale Local School Dist.,100 Ohio St.3d 141, 2003-Ohio-5357, wherein it was held that "[a]n employee who is receiving temporary total disability compensation pursuant to R.C. 4123.56 may not be discharged solely on the basis of absenteeism or inability to work, when the absence or inability to work is directly related to an allowed condition." Id. at syllabus.
 {¶ 16} Secondly, relator argued that the commission abused its discretion in finding that claimant's absences on April 25, April 26, and May 13, 2002, were related to the industrial injury.
 {¶ 17} Relator first maintained that the "occurrence" points assessed for April 25 and April 26, 2002, were not industrially-related because relator's May 14, 2002 termination letter memorialized that claimant had been verbally informed on April 24, 2002, that relator had a position available that met her medical restrictions and was to report to work on April 25, 2002; however, claimant did not report to work on either day. The magistrate determined that, despite claimant's alleged refusal of relator's April 24, 2002, verbal job offer, relator never gave claimant a written job offer as required by Ohio Adm. Code 4121-3-32(A)(6), which states:
"Job offer" means a proposal, made in good faith, of suitable employment within a reasonable proximity of the claimant's residence. If the claimant refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the claimant a written job offer at least forty-eight hours prior to intiating proceedings. If the employer files a motion with the industrial commission to terminate payment of compensation, a copy of the written offer must accompany the employer's initial filing.
 {¶ 18} While acknowledging that the foregoing rule is written in the context of an employer's motion to terminate TTD compensation, rather than an employer's attempt to preclude payment of TTD compensation, the magistrate determined that the rule applied to relator's attempt to use evidence of a verbal job offer to, in effect, justify its ultimate termination of employent and finding that the termination is voluntary so as to preclude the payment of TTD compensation. Accordingly, the magistrate determined that the written job offer rule set forth in Ohio Adm. Code 4121-3-32(A)(6) effectively precluded relator from claiming that its verbal job offer bars the commission from finding that the April 25 and April 26, 2002 missed work days were related to claimant's industrial injury.
 {¶ 19} Relator concedes that claimant was never given a written job offer. However, relator objects to the magistrate's application of the written job offer rule to the circumstances of the instant case. We agree with the magistrate's analysis of this issue and therefore overrule relator's objection in this regard.
 {¶ 20} Relator also argued that the "occurrence" point assessed for May 13, 2002, was not related to claimant's industrial injury because claimant had been untruthful to relator regarding the nature of her absence that day. The magistrate found no evidence in the record to support relator's accusation. The magistrate further found that the urgent care physician's May 13, 2002 report certifying that claimant was "totally disabled" from May 10 to May 15, 2002, supported the commission's determination that claimant's absence on May 13, 2002, was due to her industrial injury. Relator does not object to this finding.
 {¶ 21} Relator does, however, object to the magistrate's failure to address the commission's alleged error in failing to assess two "occurrence" points to claimant's alleged "no call/no show" absence on May 14, 2002. The magistrate's failure in this regard is of no consequence. Even if claimant's alleged" no call/no show" absence on May 14, 2002, could be assessed two "occurrence" points, the medical evidence noted above establishes that claimant was totally disabled due to her industrial injury on May 14, 2002.
 {¶ 22} Because the evidence of record establishes that claimant's absences from work on April 25, April 26, May 13, and May 14, 2002, were injury-related, the commission properly applied Pretty Products, Inc. in determining that those absences could not form the basis for finding that claimant voluntarily abandoned her employment sufficient to bar receipt of TTD compensation.
 {¶ 23} Following independent review pursuant to Civ.R. 53(C), we find that the magistrate has properly determined the pertinent facts and applied the relevant law to those facts. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.
 {¶ 24} In accordance with the recommendation contained in the magistrate's decision, and having overruled relator's objections to the magistrate's decision, the requested writ of mandamus is denied.
Objections overruled; writ denied.
LAZARUS and WATSON, JJ., concur.
DESHLER, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 MAGISTRATE'S DECISION IN MANDAMUS {¶ 25} In this original action, relator, NIFCO, LLC ("Nifco"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting temporary total disability ("TTD") compensation to respondent Tracey Woods ("claimant") beginning April 30, 2002, and to enter an order denying said compensation on grounds that claimant voluntarily abandoned her employment at Nifco.
Findings of Fact
 {¶ 26} 1. On April 24, 2002, claimant sustained an industrial injury while employed as an assembler for Nifco. On that date, while lifting a tote filled with parts, claimant felt a sharp pain in her left shoulder and upper arm. The industrial claim was later allowed for "left shoulder sprain," and was assigned claim number 02-353315.
 {¶ 27} 2. On the date of her injury, claimant presented to the First Medical Urgent Family Care Center ("urgent care") located in Lancaster, Ohio, where she was examined by one of the urgent care physicians, Thomas Vajen, M.D. Dr. Vajen's office note of April 24, 2002 reads:
 {¶ 28} "* * * She was having difficulty abducting and adducting the left shoulder. She has pain posterior in the trapzius [sic] and posterior shoulders as well as the deltoid. * * *
 {¶ 29} "* * * She is to be on light duty and no lifting over ten pounds and no repetitive use of the left arm. We will place the left arm in a sling. We will recheck her on Sunday."
 {¶ 30} 3. Dr. Vajen also completed a bureau form captioned "Physician's Report of Work Ability" dated April 24, 2002. On this form, Dr. Vajen indicated that claimant may return to work "with restrictions" from April 25, 2002 to April 29, 2002. Dr. Vajen wrote: "Use sling."
 {¶ 31} 4. On April 25, 2002, claimant returned to urgent care and was examined by John Scott, M.D. Dr. Scott wrote:
 {¶ 32} "* * * She states that she was here yesterday and started on medications but the pain was even worse today. She states that she has trouble moving the shoulder at all. * * *
 {¶ 33} "* * * She will be on no use of the left arm until the 29th. * * *"
 {¶ 34} 5. Claimant returned to urgent care on April 30, 2003, and was examined by John Hazlip, M.D. Dr. Hazlip's office note of April 30, 2002 reads:
 {¶ 35} "* * * She states that she is not getting any better, and she is not currently working. She states that the meds are taking [sic] her too drowsy * * *.
 {¶ 36} "* * * She has some mild Posterior cervical spine tenderness, but she is very tender to the anterior belly of the SCM and over the trapezial area she is exquisitely tender and also very tender in the anterior gleno-humeral joint. * * * She has marked limitation of motion of the left shoulder including internal and external rotation, Abduction, and Adduction. Xray of the left shoulder is negative.
 {¶ 37} "Impression: Right shoulder strain. Rule out Rotator cuff tear. Right trapezius muscle strain. Discharge: Will schedule for an MRI of the left shoulder, and will have her off work until 5/6 and recheck her on that day * * *."
 {¶ 38} 6. Dr. Hazlip also completed a "Physician's Report of Work Ability" form dated April 30, 2002, on which he certified that claimant is "totally disabled from work from 4/30/02 to 5/6/02."
 {¶ 39} 7. On May 2, 2002, pursuant to Dr. Hazlip's orders, claimant underwent an MRI of the left shoulder. The interpreting radiologist, Dr. Enlow, M.D., wrote:
 {¶ 40} "Some elevated signal seen within the distal supraspinatus tendon raises suspicion for the possibility of tendonitis or tendinopathy. The possibility of partial tear cannot be excluded. I do not detect evidence of full thickness tear or retraction."
 {¶ 41} 8. On May 7, 2002, claimant presented to Fairfield Medical Center Emergency Room where she was examined by an emergency room physician. The physician wrote that claimant should be off work that day and the next four days. X-rays of the cervical spine were taken with negative results.
 {¶ 42} 9. On May 10, 2002, claimant returned to urgent care and was examined by Charles Pruitt, M.D. Dr. Pruitt's office note of May 10, 2002 reads:
 {¶ 43} "* * * She is to return to work with restrictions per BWC sheet[.] Restrictions are temporary until evaluated by Dr[.] Higgins or Dr[.] Banks[.] She was specifically advised not to use Vicodin or other pain medications before driving to work or at work. She may use prednisone every day."
 {¶ 44} 10. Dr. Pruitt completed a "Physician's Report of Work Ability" form dated May 10, 2002. On the bureau's form, Dr. Pruitt indicated that claimant may return to work" with restrictions" from May 10, 2002 to May 16, 2002.
 {¶ 45} 11. Apparently, on May 13, 2002, claimant called in to urgent care complaining of "acute pain" and stating that she was scheduled to see a Dr. Wyatt on May 14, 2002. Consequently, an urgent care physician completed another "Physician's Report of Work Ability" form certifying that claimant "is totally disabled from work from 5/10/02 to 5/15/02."
 {¶ 46} 12. On May 14, 2002, claimant first saw orthopedist, David J. Wyatt, M.D. Dr. Wyatt wrote:
 {¶ 47} "* * * The pain is excruciating. She will not allow me to move her left shoulder at all. She has neck pain. She is in a soft collar today that was put on by her doctor of record.
 {¶ 48} "I cannot do any examination of her left shoulder secondary to the pain. She does have an MRI which shows that she has some rotator cuff tendonitis and at least a partial thickness tear, if not a possible full thickness tear.
 {¶ 49} "At this point in time, I think Ms. Woods would benefit from an injection into the subacromial space with some Prednisone, Lidocaine, and Marcaine to relieve her of her pain and then allow her to be manipulated and start physical therapy to strengthen the rotator cuff. I also think she would benefit from anti-inflammatories. This is just a consult, but I think this would be the best form of treatment for her left shoulder. * * *"
 {¶ 50} 13. Dr. Wyatt completed a C-84 on May 21, 2002. On the C-84, Dr. Wyatt certified a period of TTD beginning May 14, 2002 to an estimated return-to-work date of June 3, 2002.
 {¶ 51} 14. In the meantime, on May 2, 2002, claimant filed an application for workers' compensation benefits.
 {¶ 52} 15. On May 7, 2002, the bureau mailed an order allowing the claim for a left shoulder sprain and granting TTD compensation beginning April 30, 2002, based upon the urgent care documentation.
 {¶ 53} 16. Nifco administratively appealed the bureau's May 7, 2002 order.
 {¶ 54} 17. By letter dated May 14, 2002, Nifco terminated claimant's employment. Nifco's letter of termination states:
 {¶ 55} "Per your request on April 24, 2002 you stated that you needed to work in a position with light duty not using your left arm. After reviewing your physician's requirements for light duty we found a position for you that would accommodate these requirements. I called on Wednesday, April 24, 2002 and informed you that we have a position that meets the requirements of your physician and to report to work on Thursday, April 25, 2002. You have not reported to work since April 24, 2002.
 {¶ 56} "As of May 14, 2002, your attendance record shows that you have now accumulated 8 ½ points. Nifco LLC attendance policy states that after accumulating 7 points your employment at Nifco LLC will be terminated. Therefore your employment with Nifco LLC is terminated as of May 14, 2002.
 {¶ 57} "You were pointed on the following dates:
Date Points
 7/18/01 1.00 4/02/02 1.00 4/04/02 0.50 4/08/02 1.00 4/25/02 1.00 4/26/02 1.00 5/13/02 1.00 5/14/02 2.00 no call/no show
Total 8.50 points"
 {¶ 58} 18. The record contains Nifco's attendance policy:
 {¶ 59} "ATTENDANCE POLICY
 {¶ 60} "* * * [T]he Company provides seven (7) unpaid occurrence days for each hourly Associate's use. When absent, you must call and indicate the duration of your absence. If you are going to be tardy or absent for any reason, you should telephone your Supervisor as far in advance of your regularly scheduled shift as possible and indicate when you will be able to return to work.
 {¶ 61} "It is your responsibility to ensure that propernotification is given.
 {¶ 62} "* * *
 {¶ 63} "Attendance will be monitored on a `revolving year' basis beginning on the date of the first occurrence.
 {¶ 64} "* * *
 {¶ 65} "Occurrences are as follows:
 Absent full day 1 occurrence Complete less than ½ of shift 1 occurrence Complete more than ½ of shift ½ occurrence No call/No show 2 occurrences No call/No show-two days-consecutive Termination
"* * *
"* * * If you are away from work for two (2) or more consecutive days and a doctor's note is submitted, only one occurrence will be recorded." (Emphasis sic.)
 {¶ 66} 19. Following a June 20, 2002 hearing, a district hearing officer ("DHO") issued an order stating that the bureau's order was modified. The DHO allowed the claim for "left shoulder sprain."
 {¶ 67} The DHO's order further states: "Temporary total disability compensation is denied from 04/30/2002 forward.
 {¶ 68} "The District Hearing Officer finds the injured worker voluntarily abandoned her employment, pursuant to the standard set forth in the Louisiana-Pacific [State ex rel. Louisiana-Pacific Corp. v.Indus. Comm. (1995), 72 Ohio St.3d 401] case. The District Hearing Officer notes the employer has a written policy governing attendance. Part of this policy includes a system that assigns points to workers when they are tardy or absent. Significantly, the District Hearing Officer finds that employees are assigned occurrence points for sick days, even if the sick employee calls off appropriately or properly submits a written doctor's excuse for an extended illness.
 {¶ 69} "The District Hearing Officer finds the injured worker knew this policy, and this knowledge is evidenced by the signed `Receipt of Associate Handbook,' dated 08/30/2001.
 {¶ 70} "The District Hearing Officer further finds that the injured worker properly called off due to her injury on 04/25/2002; 04/26/2002 and 04/29/2002 and that on 04/30/2002 and 05/07/2002 she properly submitted by fax doctor's excuses for extended absences. The District Hearing Officer finds the employer adjusted the number of occurrence points assigned to her accordingly. The District Hearing Officer finds on 05/14/2002 the injured worker neither called in nor appeared for work. The District Hearing Officer finds, nonetheless, that the injured worker accumulated sufficient occurrence points under the employer's written policy to be terminated. The District Hearing Officer also finds this policy expressly states that termination will result if an employee exceeds seven occurrences. The injured worker had 8.50.
 {¶ 71} "The injured worker violated a written work rule the consequence of which was known to the injured worker to be termination. Therefore, pursuant to Louisiana-Pacific she is found to have voluntarily abandoned her employment and therefore is not entitled to temporary total disability compensation."
 {¶ 72} 20. Claimant administratively appealed the June 20, 2002 DHO's order.
 {¶ 73} 21. Following a July 23, 2002 hearing, a staff hearing officer ("SHO") issued an order stating:
 {¶ 74} "The order of the District Hearing Officer, from the hearing dated 06/20/2002, is modified to the following extent.
 {¶ 75} "The Staff Hearing Officer finds that the claim remains allowed for: `LEFT SHOULDER SPRAIN' as a result of a 04/24/2002 injury when the injured worker put down a full tote of parts.
 {¶ 76} "The Staff Hearing Officer specifically finds that the inured worker did not abandon her job voluntarily and is therefore entitled to an award of temporary total disability compensation. Therefore, based upon the reports of the physicians of First Medical Urgent and Family Care from 04/30/2002 to 05/13/2002 and the C-84 dated 05/21/2002 of the 05/14/2002 office visit of Dr. David Wyatt temporary total is ordered paid from 04/30/2002 to 06/03/2002 and additional upon submission of proof to support continuing payment.
 {¶ 77} "The Staff Hearing Officer finds that the injured worker advised the employer that she was absent from employment on 04/25/2002, 04/26/2002, and 05/13/2002 due to her injury.
 {¶ 78} "This was based upon her testimony at the hearing and in part on the phone records submitted and her testimony that she faxed doctors excuses for those three days. Therefore[,] the only days she could be assessed per the employee handbook are:
 "07/18/2001 — 1 04/02/2001 — 1 04/04/2002 — .5 04/08/2002 — 1 05/14/2002 — 1
4.5 points
 {¶ 79} "Therefore, pursuant to the `Disciplinary Action' she did not meet the requisite 7 points necessary for termination.
 {¶ 80} "Therefore, the Staff Hearing Officer finds that the injured worker did not voluntarily abandon her employment by violation of a written work rule to preclude payment of temporary total disability pursuant to State ex rel. Louisiana Pacific Corporation v. IndustrialCommission of Ohio, 1995, 72 Ohio St.3d 401.
 {¶ 81} "Further, the Staff Hearing Officer finds that State exrel. Pretty Products, Inc. v. Industrial Commission, 1996,77 Ohio St.3d 5 supports the payment of temporary total disability. Here the decision held that an injured worker does not voluntarily abandon her former position of employment because they did not timely submit an excuse slip from her doctor.
 {¶ 82} "Therefore, the Staff Hearing Officer finds that the injured worker has met her burden of proving that she did not voluntarily abandon her position of employment and is therefore entitled to an award of temporary total disability."
 {¶ 83} 22. On August 16, 2002, another SHO mailed an order refusing relator's appeal from the July 23, 2002 SHO order.
 {¶ 84} 23. On October 8, 2002, relator, NIFCO, LLC, filed this mandamus action.
Conclusions of Law
 {¶ 85} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 86} In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.
(1995), 72 Ohio St.3d 401, 403, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
 {¶ 87} "* * * [W]e find it difficult to characterize as `involuntary' a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft [State ex rel. Ashcraft v. Indus. Comm. (1987),34 Ohio St.3d 42] and Watts [State ex rel. Watts v. Schottenstein StoresCorp. (1993), 68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts."
 {¶ 88} In State ex rel. Pretty Products, Inc. v. Indus. Comm.
(1996), 77 Ohio St.3d 5, the claimant was initially injured in February 1990. The claim was allowed for "sprain/strain lumbosacral." On November 8, 1990, the claimant left work and went to the hospital because of back pain. In a series of medical excuse slips, Dr. Magness certified that the claimant was unable to return to her former job. The last of these medical slips certified that the claimant could return to work on March 1, 1991.
 {¶ 89} The claimant, in Pretty Products, did not return to work on Friday, March 1, 1991, nor did she then produce an excuse slip that extended her disability. The claimant did not report to work on the following Monday or Tuesday and consequently she was terminated pursuant to a provision of the union/management agreement.
 {¶ 90} In June 1991, the claimant, in Pretty Products, moved the commission for TTD compensation beginning November 8, 1990 based on the first claim. In support, claimant submitted a June 8, 1991 C-84 that was based upon an April 26, 1991 exam and certified TTD beginning November 8, 1990 to an estimated return-to-work date of August 1, 1991.
 {¶ 91} In August 1991, the claimant, in Pretty Products, filed a second workers' compensation claim alleging that she had injured her low back, neck, and shoulders on November 8, 1990. The employer refused to certify the second claim contending that it was a "reoccurrence" of the first claim. In October, the claimant filed a motion in the second claim requesting TTD compensation from November 8, 1990. A DHO allowed the second claim but denied TTD compensation on grounds that the claimant's discharge constituted a voluntary abandonment of her former position of employment. On appeal, the SHOs granted TTD compensation stating:
 {¶ 92} "* * * [`]It is found that the claimant did not voluntarily abandon her former position of employment on 3/4/91 for the reason that she did not timely submit an excuse slip from her doctor.' * * *" Id. at 6.
 {¶ 93} In Pretty Products, the employer filed a mandamus action in this court but this court denied the writ. On appeal to the Supreme Court of Ohio, this court's judgment was reversed and a writ of mandamus issued. The Supreme Court of Ohio, in Pretty Products, found that the commission's order granting TTD compensation was too vague to be reviewed and thus a remand to the commission was ordered.
 {¶ 94} The Pretty Products court instructed:
 {¶ 95} "The receipt of temporary total disability ('TTD') compensation rests on a claimant's inability to return to his or her former job as a direct result of an industrial injury. State ex rel.Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630 * * * syllabus. How-ever, eligibility may be compromised when the claimant is no longer employed at that job. Once a claimant is separated from the former position of employment, future TTD compensation eligibility hinges on the timing and character of the claimant's departure.
 {¶ 96} "The timing of a claimant's separation from employment can, in some cases, eliminate the need to investigate the character of departure. For this to occur, it must be shown that the claimant was already disabled when the separation occurred. `[A] claimant can abandon a former position or remove himself or herself from the work force only if he or she has the physical capacity for employment at the time of the abandonment or removal.' State ex rel. Brown v. Indus. Comm. (1993),68 Ohio St.3d 45, 48 * * *" Id. at 6-7.
 {¶ 97} The Pretty Products court also distinguishedLouisiana-Pacific, supra, stating:
 {¶ 98} "* * * [T]here is an important distinction betweenLouisiana-Pacific and this case. In the former, there was no evidence that the claimant's absences were due to industrial injury, while in this case there is. Whether this distinction is ultimately outcome-determinative, however, cannot be decided absent clarification of the commission's reasoning." Id. at 7-8.
 {¶ 99} Here, the commission, through its SHO, refused to recognize Nifco's assessment of "occurrence" points for April 25, 2002, April 26, 2002, and May 13, 2002, on grounds that those "occurrences" were related to the industrial injury. In so doing, the commission relied upon PrettyProducts. This had the effect of reducing the occurrence points under Nifco's policy well below the seven needed for termination. Thus, the commission found that the termination was not voluntary and that claimant was entitled to TTD compensation.
 {¶ 100} The commission correctly applied Pretty Products to eliminate the three "occurrence" points assessed by Nifco for April 25, 2002, April 26, 2002, and May 13, 2002. The medical evidence of record undisputedly shows that claimant was unable to return to her former position of employment beginning April 24, 2002 and running continuously to June 3, 2002, based upon the urgent care documentation and the C-84 from Dr. Wyatt.
 {¶ 101} Here, relator argues that the commission was duty-bound to accept Nifco's attendance policy as Nifco had written and applied it. Relator emphasizes that Nifco assesses occurrence points under its policy for missed days of work regardless of whether the absence is related to an industrial injury. Relator asserts that Louisiana-Pacific commands that the commission accept Nifco's termination as a voluntary abandonment of employment without regard to the industrial injury. Relator is incorrect, as Pretty Products indicates. Clearly, the commission has a duty under Louisiana-Pacific and Pretty Products to review the employer's application of its attendance policy so that it complies with the workers' compensation laws. The commission performed that duty here.
 {¶ 102} Relator further argues that the commission abused its discretion in finding that the missed days on April 25, 2002, April 26, 2002, and May 13, 2002, were related to the industrial injury.
 {¶ 103} With respect to April 25, 2002 and April 26, 2002, Nifco points out that its May 14, 2002 termination letter memorializes that claimant was verbally informed on April 24, 2002 that Nifco had a position that met her medical restrictions and to report to work on April 25, 2002. Claimant did not report to work on April 25, 2002 or on April 26, 2002, but instead called in.
 {¶ 104} Nifco asserts here that the commission abused its discretion in determining that the April 25, 2002 and April 26, 2002 occurrence points were industrially related because Nifco verbally offered claimant alternative employment. Nifco is incorrect.
 {¶ 105} Ohio Adm. Code 4121-3-32(A)(6) states:
 {¶ 106} "`Job offer' means a proposal, made in good faith, of suitable employment within a reasonable proximity of the claimant's residence. If the claimant refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the claimant a written job offer at least forty-eight hours prior to initiating proceedings. If the employer files a motion with the industrial commission to terminate payment of compensation, a copy of the written offer must accompany the employer's initial filing."
 {¶ 107} Here, despite claimant's alleged refusal of Nifco's April 24, 2002 verbal job offer, Nifco never gave claimant a written offer. The magistrate recognizes that the commission's job offer rule is written in the context of an employer's motion to terminate TTD compensation. Here, the employer never moved to terminate TTD compensation. Rather, the employer endeavored to preclude the payment of TTD compensation. Nevertheless, Nifco attempts to use evidence of a verbal job offer to, in effect, justify its ultimate termination of employment and a finding that the termination is voluntary so as to preclude the payment of TTD compensation. In the magistrate's view, the written job offer rule effectively precludes Nifco from claiming that its verbal job offer bars the commission from finding that the April 25, 2002 and April 26, 2002 missed days of work were industrially related.
 {¶ 108} To remand this matter to the commission for a determination of whether the claimant justifiably refused or ignored Nifco's job offer where a written offer was never given to the claimant would violate the clear intent of Ohio Adm. Code 4121-3-32(A)(6). See State ex rel. Coxsonv. Dairy Mart Stores of Ohio, Inc. (2000), 90 Ohio St.3d 428.
 {¶ 109} As previously noted, Nifco also contends that the commission abused its discretion in finding that the absence on May 13, 2002 was related to the industrial injury. In its brief, Nifco asserts:
 {¶ 110} "* * * On May 13, 2002, Woods contacted Jarrett Jumper at NIFCO and left a message saying that she was going to the doctor that day and would not be in. On May 13, 2002, Woods' scheduled work shift would have ended at 2:30 p.m. However, Woods' doctor never examined her on May 13, 2002. In fact, Woods did not telephone her doctor until approximately 5:30 p.m. that evening. Therefore, Woods' absence on May 13, 2002 was also unrelated to her industrial injury and was correctly recorded as an occurrence." (Relator's brief at 8.)
 {¶ 111} The factual assertions of counsel in Nifco's brief cannot be accepted as evidence or fact in this action in the absence of that evidence being contained in the stipulated record before this court. There is no evidence in the record that on May 13, 2002, claimant contacted Jarrett Jumper at Nifco and left a message saying that she was going to the doctor that day and would not be in.
 {¶ 112} Nifco asserts here that it was justified in assessing one occurrence point for May 13, 2002, because claimant "was untruthful to her employer regarding the nature of her absence on May 13, 2002." (Relator's brief at 9.)
 {¶ 113} There is no evidence in the record supporting Nifco's accusation that claimant was untruthful to her employer on May 13, 2002. Moreover, there is no evidence in the record to support the suggestion that Nifco's assessment of an occurrence point on May 13, 2002 was for the alleged untruthfulness.
 {¶ 114} The commission found that claimant's absence on May 13, 2002 was due to her industrial injury. The medical records before this court support the commission's determination. On May 13, 2002, as previously noted, an urgent care physician completed a "Physician's Report of Work Ability" form on which he certified that claimant "is totally disabled from work from 5/10/02 to 5/15/02." Clearly, that physician's report is some evidence supporting the commission's decision to eliminate the May 13, 2002 occurrence point. Pretty Products, supra.
 {¶ 115} In short, the commission's determination that claimant did not voluntarily abandon her employment at Nifco was not an abuse of discretion.
 {¶ 116} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
KENNETH W. MACKE, MAGISTRATE